**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

GREGORY JOHN BUSHYHEAD,    )
    )
    Petitioner,    )
    )
v.    )    **Case No. 10-CV-0797-CVE-FHM**
    )
MICHAEL WADE, Warden,[1]    )
    )
    Respondent.    )

## OPINION AND ORDER

Before the Court is the 28 U.S.C. § 2254 petition for writ of habeas corpus (Dkt. # 1) filed by Petitioner Gregory Bushyhead, a state inmate represented by counsel. In its Opinion and Order, dated July 28, 2011, the Court stayed this proceeding. (Dkt. # 10). On October 4, 2011, the Court lifted the stay. Respondent filed a response to the petition (Dkt. # 14) and provided the state court records (Dkt. # 16) necessary for the adjudication of Petitioner's claims. Petitioner filed a reply (Dkt. # 17). For the reasons discussed below, the petition for writ of habeas corpus shall be denied.

### *BACKGROUND*

On March 8, 2007, Petitioner was the driver of a vehicle involved in a fatality collision at the intersection of Lewis Avenue and Skelly Drive, in Tulsa, Oklahoma. Following an investigation, Petitioner was charged in Tulsa County District Court, Case No. CF-2007-3179, with DUI-Manslaughter (Count I), Leaving the Scene of Accident - Personal Injury (Count II), and Driving

---

[1] Petitioner is currently in custody at the Jim E. Hamilton Correctional Center, in Hodgen, Oklahoma. Pursuant to Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts, Michael Wade, Warden, is the proper respondent. Therefore, Michael Wade, Warden, is hereby substituted as the respondent in this case. The Court Clerk shall be directed to note such substitution on the record.

While Under the Influence of Intoxicating Liquor (Count III). (Dkt. # 16-21, O.R. at 1). Evidence presented at Petitioner's jury trial demonstrated the following facts. On the evening of the collision, Petitioner met his father and a childhood friend, Nicki Remus, for dinner at McGill's Restaurant located at 21st Street and Utica Avenue in Tulsa. (Dkt. # 16-9, Tr. Vol. IV at 991-92). All three individually drove to the restaurant. Id. at 995. During dinner, Petitioner consumed two vodka tonics. Id. at 993-94. After dinner, Petitioner followed Ms. Remus back to her house, where she parked her car and got into Petitioner's truck. Id. at 996. They went to the Gray Snail, a bar/restaurant located at 15th Street and Peoria Avenue in Tulsa. Id. at 997. There, Petitioner had at least one more alcoholic drink.[2] After approximately an hour, Petitioner and Ms. Remus returned to her house near 39th Street and Quaker Avenue. Id. at 999. At about 11:00 p.m., Petitioner left her house. Id. at 1000. Petitioner testified that he did not consume any additional alcohol while at Ms. Remus' house. Id.

After leaving Ms. Remus' house, Petitioner proceeded to go to his house, located at 54th Street and Atlanta Avenue. Id. Petitioner testified that, as he traveled southbound on Lewis Avenue, he was following a white truck. Id. at 1002. As he approached the intersection of Lewis Avenue and Skelly Drive, Petitioner testified that he looked ahead and noticed a northbound car on Lewis Avenue "start[] to make a turn extremely early as though it was going to try to maintain a lot of speed and take the corner real short." Id. at 1002-03. The car did not make the turn, returned back to its northbound lane, and stopped. Id. at 1004. Jeffrey Underwood, a witness, testified that, prior to the collision, the northbound car was still in its lane of traffic, but partially in the

_____

[2]Petitioner testified that he also had a "sweet drink," but he did not know whether that drink contained alcohol. (Dkt. # 16-9, Tr. Vol. IV at 998-99).

intersection, waiting to make its turn.  (Dkt. # 16-7, Tr. Vol. II at 441-42).  Petitioner testified that the last time he looked at the light it was green, but admitted that he failed to look again before entering the intersection.  (Dkt. # 16-9, Tr. Vol. IV at 1004).  According to Petitioner, after the truck in front of him passed through the intersection, the northbound car accelerated and turned in front of Petitioner.  Id.  As a result, Petitioner's vehicle hit the passenger side of the car as it attempted to turn left.  Id.  Witnesses testified that the traffic light was red when both vehicles entered the intersection.  (Dkt. # 16-7, Tr. Vol. II at 402, 441-42).  Data recovered from Petitioner's vehicle showed that he was not speeding at the time of the collision.  (Dkt. # 16-8, Tr. Vol. III at 734).

There were two men in the northbound car, Robert McGrew, the driver, and Richard Brown, his passenger.  (Dkt. # 16-8, Tr. Vol. III at 588-91).  Mr. Brown died shortly after the collision. After the collision, Petitioner exited his vehicle, looked at the scene, and then fled on foot.  Id. at 446-447, 464.  Approximately 15-20 minutes after the collision, Tulsa Police Officer Jason Beauchamp found Petitioner in a nearby residential neighborhood, bent over behind a wall.  (Dkt. # 16-8, Tr. Vol. III at 485, 497).  Officer Beauchamp observed that Petitioner had a little bit of blood on him, vomit on his shirt, a strong odor of alcohol, and had difficulty standing and walking.  Id. at 490-91.  Petitioner was placed in handcuffs and transported to Oklahoma State University (OSU) Medical Center in Tulsa, Oklahoma for a legal blood draw.  Id. at 496, 539-540.  Petitioner refused a breathalyzer test.  (Dkt. # 16-21, O.R. at 34).  The blood test revealed Petitioner had a blood alcohol level of 0.24.  (Dkt. # 16-9, Tr. Vol. IV at 882).

In September 2008, Petitioner, represented by attorney Allen M. Smallwood, was tried by jury and convicted of First Degree Manslaughter (Count I) and Leaving the Scene of an Injury Accident (Count II).  The trial court had previously dismissed Count III.  (Dkt. # 16-21, O.R. at 2,

5).  On October 28, 2008, in accordance with the jury's recommendation, the trial judge sentenced Petitioner to fourteen (14) years imprisonment on Count I, and nine (9) years imprisonment and a fine of $6,500 on Count II, with the sentences ordered to run consecutively.  Id. at 10, 13.

Petitioner perfected a direct appeal to the Oklahoma Court of Criminal Appeals (OCCA). Represented by attorney Kevin D. Adams, Petitioner raised three (3) propositions of error, as follows:

> Proposition I:       The Appellant was denied a fair trial because the jury was improperly instructed on the elements of manslaughter.
>
> Proposition II:      The Appellant was denied a fair trial by the court's refusal to give the requested theory of defense instruction.
>
> Proposition III:     The Appellant was denied a fair sentence by the court's refusal to properly consider the available sentencing options because the Appellant was convicted at a jury trial.

(Dkt. # 14-1).  By Order filed, the OCCA affirmed the Judgment and Sentence of the district court. (Dkt. # 14-3).

On October 19, 2009, Petitioner filed a Motion for Judicial Review requesting modification of his sentence.  (Dkt. ## 1 at 6; 14-6 at 1).  The district court granted relief, modifying the sentence for Count II from nine (9) years imprisonment to run consecutively, to nine (9) years suspended to run consecutively to Count I.  (Dkt. # 14-6 at 1-2).

On September 8, 2010, Petitioner filed an application for post-conviction relief, raising ten (10) propositions of error, summarized by this Court, as follows:

> Proposition I:       Defendant was denied his right to due process when the expert opinion testimony offered by the State misinformed the jury as to the law in the State of Oklahoma and led the jury to believe that Defendant was clearly at fault for the accident and therefore satisfied the third element of misdemeanor manslaughter.

4

| | |
|---|---|
| Proposition II: | Defendant was deprived of a fair and impartial jury as a result of juror misconduct when Juror Reeves admitted that he had a car accident with a drunk driver and told the other jurors about the incident. |
| Proposition III: | Defendant was deprived of his 5th Amendment privilege against self incrimination when Sergeant Bondy was allowed to testify, over defense counsel objections, to statements Defendant allegedly made during the booking process without being read his Miranda rights. |
| Proposition IV: | Defendant was convicted of a violation of Okla. Stat. tit. 47, § 10-102(1) when he was charged with a violation of Okla. Stat. tit 47 § 10-102 and bound over only on that charge. |
| Proposition V: | Defendant was denied access to possible exculpatory evidence when the State failed to turn over a recording of a police interview with Mr. McGrew, the other driver, and the results of Mr. McGrew's blood alcohol test results during discovery. |
| Proposition VI: | Defendant was denied due process because he was not provided the results of his blood alcohol test for over 90 days, when he had only 60 days to request test results so he could have it tested by his own experts. |
| Proposition VII: | Defendant's motion to suppress the State's blood alcohol test should have been granted and that evidence suppressed. |
| Proposition VIII: | Trial court's denial of a proximate cause instruction deprived Petitioner of his right to present a defense. |
| Proposition IX: | Defendant was denied a fair trial because the jury was improperly instructed on the elements of manslaughter due to the blending of the jury instructions for driving under the influence and driving while impaired. |
| Proposition X: | Cumulative error denied Defendant his due process rights to a fair trial. |

(Dkt. # 14-4). In his application, Petitioner also raised claims of ineffective assistance of trial and

appellate counsel. Id. at 10. On October 14, 2010, the district court denied the application, stating

that the claims in propositions eight and nine were barred by res judicata, that the remaining eight

propositions could have been raised on direct appeal, were not, and thus were waived, and that Petitioner failed to show ineffective assistance of counsel.  (Dkt. # 14-4).  After being granted a post-conviction appeal out of time, Petitioner, represented by attorney Bill J. Nunn, argued that "(1) certain issues not raised on direct appeal should not be considered as waived because there was no knowing and intelligent waiver of those issues, and (2) waived issues were the direct result of ineffective assistance of appellate counsel."  (Dkt. # 14-5).  On September 29, 2011, the OCCA affirmed the denial of post-conviction relief.  Id.

On December 14, 2010, represented by attorney Nunn, Petitioner filed his federal petition for writ of habeas corpus (Dkt. # 1).  Petitioner raises ten (10) grounds of error, as follows:

| | |
|---|---|
| Ground I: | Petitioner was denied due process of law and his right to a jury trial when the State's accident reconstructionist invaded the province of the jury, misinforming them on the law. |
| Ground II: | Juror misconduct deprived Petitioner of fair and impartial jury. |
| Ground III: | Miranda violation. |
| Ground IV: | Appellant was denied his due process rights to a jury trial because the jury was improperly instructed on the elements of manslaughter. |
| Ground V: | Petitioner was denied a fair trial by the trial court's refusal to give the requested theory of defense instruction. |
| Ground VI: | The blood alcohol testing procedure was flawed as well as the chain of custody for the sample. |
| Ground VII: | Petitioner was deprived of due process right to have blood alcohol sample independently tested as a result of the delay in providing him the blood test results and charging him with manslaughter DUI. |
| Ground VIII: | The failure to provide copies of possible exculpatory evidence to Petitioner deprived him of due process. |
| Ground IX: | As a result of ineffective assistance of appellate counsel Petitioner was denied due process. |
| Ground X: | Petitioner was sentenced outside the boundaries of the Count II charge. |

(Dkt. # 1).  In Ground II, Petitioner also claims that trial counsel provided ineffective assistance in failing to move for a mistrial.  Id. at 20.  In response to the petition, Respondent initially filed a motion to dismiss for failure to exhaust available state court remedies.  (Dkt. # 6).  The Court denied the motion to dismiss and granted a stay to allow Petitioner to return to the state courts to complete the post-conviction appeal process.  See Dkt. # 10 at 5-6.  The Court lifted the stay on October 4, 2011.  (Dkt. # 13).  Respondent then filed a response (Dkt. # 14), arguing that Grounds IV and V are state law issues and not cognizable for habeas review, that the decision by the OCCA on Ground IX was not contrary to or an unreasonable application of Supreme Court precedent, and that a procedural bar applies to the remaining grounds for relief.  In reply (Dkt. # 17), Petitioner argues that Grounds IV and V are not "a matter of state law not subject to Federal Habeas Corpus Review," id. at 7, and that ineffective assistance of appellate counsel is cause for the procedural default of the remaining claims in his habeas petition, id. at 9.

## ANALYSIS

### A.    Exhaustion/Evidentiary hearing

As an initial matter, the Court must determine whether Petitioner meets the exhaustion requirements of 28 U.S.C. § 2254(b).  See Rose v. Lundy, 455 U.S. 509, 510 (1982).  Petitioner presented his claims to the OCCA on direct and post-conviction appeal.  Therefore, he has exhausted his state court remedies.

In addition, Petitioner has not met his burden of proving entitlement to an evidentiary hearing.  See Williams v. Taylor, 529 U.S. 420 (2000); Miller v. Champion, 161 F.3d 1249 (10th Cir. 1998).

**B.**      **Claims adjudicated by the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 386 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner.  See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

In this case, the OCCA adjudicated the merits of Grounds IV and V on direct appeal and Ground IX on post-conviction appeal.  Therefore, to the extent his claims are cognizable in this federal habeas corpus proceeding, they shall be reviewed pursuant to 28 U.S.C. § 2254(d).

1.      **Improper jury instructions (Ground IV)**

In Ground IV, Petitioner claims he was denied due process rights to a jury trial because the trial court "blended the jury instructions for DUI and DWI into one incoherent instruction that omitted essential parts of DWI." (Dkt. # 1 at 24). Petitioner complains that Instruction No. 24 "misinformed the jury as to the actual elements of Driving While Impaired and made it impossible to determine if the jury unanimously found the necessary elements of a predicate misdemeanor." Id. at 26. On direct appeal, the OCCA found that when "Instructions No. 23 and 24 are read together, the applicable law of misdemeanor manslaughter was set forth" as well as the "elements of Driving While Impaired as a predicate offense of first degree manslaughter." (Dkt. # 14-3 at 2 (citing Jones v. State, 201 P.3d 869, 886 (Okla. Crim. App. 2009); Bell v. State, 172 P.3d 622, 626 (Okla. Crim. App. 2007)). Respondent "maintains the jury was properly instructed under Oklahoma law on the elements of misdemeanor manslaughter" and claims that this is a "matter of state law and not subject to federal habeas corpus review." (Dkt. # 14 at 11).

"As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'" Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997) (quoting Long v. Smith, 663 F.2d 18, 23 (6th Cir. 1981) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977))); see also Maes v. Thomas, 46 F.3d 979, 984 (10th Cir. 1995) ("A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial.").

The trial court gave thirty jury instructions at Petitioner's trial. (Dkt. # 16-22, O.R. at 188-219). Petitioner complains that Instruction No. 24 improperly combined the elements of Driving Under the Influence and Driving While Impaired. (Dkt. # 1 at 26). He directs attention to the fourth element of Instruction No. 24. Id. at 25. It reads as follows,

> Fourth, the elements of Driving a Motor Vehicle While Under the Influence of Alcohol or Driving While Impaired, the defendant is alleged to have been in the commission of are as follows:
>
> > First, driving;
> >
> > Second, with the blood alcohol concentration of 0.08 or more for Driving Under the Influence of Alcohol or with a blood alcohol concentration of more than 0.05 for Driving While Impaired;
> >
> > Third, a motor vehicle;
> >
> > Fourth, on a highway;
> >
> > Fifth, the blood alcohol test was administered on a sample taken from the defendant as soon as practical after the fatality/injury accident.

(Dkt. # 16-22, O.R. at 212). Petitioner argues that the second component fails to acknowledge that the difference between Driving Under the Influence of Alcohol and Driving While Impaired is more than just the blood alcohol concentration level. (Dkt. # 1 at 26). He argues that Driving While Impaired "includes the extra element of 'with impaired ability.'" Id. Thus, Petitioner argues, "the jury was led to believe that if [Petitioner] had a blood alcohol level of .05 or greater he was then guilty of the predicate misdemeanor regardless of whether or not he was actually impaired as required by the statute." Id. at 26-27.

After reviewing the record, the Court finds that Petitioner was not deprived of a fair trial and due process. Petitioner fails to acknowledge that Instruction No. 23 provided the jury with the information Petitioner alleges was omitted in Instruction No. 24. Instruction No. 23 contains the

10

"extra element of 'with impaired ability'" Petitioner complains is missing from Instruction No. 24.

Instruction No. 23 reads,

> If you are convinced that the amount of alcohol, by weight or volume, in the defendant's blood was more than five-hundredths of one percent (0.05%), then you may consider this evidence on the issue of whether the defendant's ability to drive a motor vehicle was impaired by alcohol. However, no person may be found to have been under impaired ability solely because of a blood alcohol count above 0.05%. <u>You must find, in addition, and beyond a reasonable doubt, that the person's driving was affected by the consumption of alcohol to the extent that the public health and safety were threatened,</u> or that the person's operation of a motor vehicle violated a State statute or local ordinance.

(Dkt. # 16-22 at 210-11) (emphasis added). Thus, the jury was instructed that blood alcohol level alone is insufficient to find that Petitioner was under impaired ability. The Court concludes that the OCCA's determination, that the applicable law was set forth when Instructions No. 23 and 24 are read together, is not contrary to or an unreasonable application of federal law. The jury instructions did not deprive Petitioner of his right to a fair trial and due process of law. Petitioner's request for habeas relief on Ground IV is denied.

### 2. Failure to give theory of defense instruction (Ground V)

In Ground V, Petitioner alleges that the "failure of the trial court to allow the theory of defense instructions was fundamental 'structural error' that defies any 'harmless error' analysis and deprived [Petitioner] of his due process rights." (Dkt. # 1 at 30). Petitioner "requested two jury instructions dealing with the proximate cause of the accident," <u>id.</u> at 28, but the trial court denied the requests, <u>id.</u> at 29. The OCCA concluded that the trial court did not abuse its discretion in refusing to give the instructions and "[a]bsent an abuse of that discretion [it] will not interfere with the trial court's judgment if the instructions as a whole accurately state the applicable law." (Dkt.

# 14-3 at 2).  Respondent argues that "[t]he decision by the OCCA . . . was a matter of state law and is not properly before this Court in a federal habeas proceeding."  (Dkt. # 14 at 15).

As stated above, jury instructions are generally not reviewed in a federal habeas corpus proceeding, "'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'"  <u>Nguyen</u>, 131 F.3d at 1357 (quoting <u>Long</u>, 663 F.2d at 23 (citing <u>Henderson v. Kibbe</u>, 431 U.S. at 154)).  "An omission or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  <u>Maes</u>, 46 F.3d at 984 (citations omitted).

Petitioner requested the following two instructions:

Jury Instruction No. 25 - The defendant's act of driving under the influence must be the direct and proximate cause of the homicide.  To the extent that Robert McGrew's act of turning left in front of the defendant was the direct and proximate cause of the accident, you must take this into consideration when determining the defendant's criminal liability.

Jury Instruction No. 26 - YOU ARE FURTHER INSTRUCTED that "proximate and actual  cause" means that defendant's unlawful conduct, should you find that he committed any unlawful conduct, such as running a yellow light or red light, can be eliminated or mitigated by the conduct of another individual, here Robert McGrew, who intentionally turned left in front of the defendant's automobile, even though the defendant might have entered the intersection on a red or yellow light.

(Dkt. # 1 at 28-29).  In its denial of these two instructions, the trial court stated, "Number 25 – the defendant's asking the Court to add a sixth element and the Court declines to do that.  And the Court declines to include defendant's requested 26."  (Dkt. # 16-10, Tr. Vol. V at 1052).  Petitioner argues that his "counsel was trying to present to the jury the important point that regardless of whether [Petitioner] was legally intoxicated he still had to be the proximate cause of the accident."  (Dkt. # 1 at 30).

After reviewing the record, the Court concludes that Petitioner was not denied due process or a fundamentally unfair trial as a result of the trial court's denial of Petitioner's requested instructions.  It appears that Petitioner sought the inclusion of these two instructions to highlight the causation element of the manslaughter instruction.  However, Instruction No. 24 required the jury to find that the death of a human occurred as the "direct result of an act or event which happened in the commission of a misdemeanor."  (Dkt. # 16-22, O.R. at 212).  Additionally, the instruction required the jury to find that the death was "caused by the defendant while in the commission of a misdemeanor."  Id.  Further, Instruction No. 17 reads, "[n]o person may be convicted of manslaughter in the first degree unless both the fact of the death of the person allegedly killed and the fact that his death was caused by the conduct of another person are established as independent facts and beyond a reasonable doubt."  Id. at 204.  Taken as a whole, the jury instructions fairly stated the law and did not deprive Petitioner of his ability to present his theory of defense.  The instructions properly stated, that to find Petitioner guilty of manslaughter, Petitioner had to be the direct cause of the death of Mr. Brown.  Habeas corpus relief on Ground V is denied.

**3.      Ineffective assistance of appellate counsel (Ground IX)**

In his ninth ground for relief, Petitioner claims that while his "Appellate counsel did a fine job on the issues he presented," his failure to raise "obvious" issues that would "leave one to conclude that they are 'dead bang winners,'" deprived Petitioner of his "fundamental rights to assistance of counsel."  (Dkt. # 1 at 39-40).  Specifically, Petitioner states that "[t]o the extent that the Tulsa County District Court may be correct that the issues stated herein as Grounds one, two, three, six, seven, and eight were not raised on direct appeal they were waived, then there clearly was ineffective assistance of appellate counsel."  Id. at 37-38.

In resolving Petitioner's claim of ineffective assistance of appellate counsel, the district court relied on Strickland v. Washington, 466 U.S. 668 (1984), stating that Strickland's two-prong test applied to appellate counsel. (Dkt. # 14-4 at 11). The court also stated that "counsel is not required to advance every argument, regardless of merit." Id. (citing Cartwright v. State, 708 P.2d 592 (Okla. Crim. App. 1985)). In affirming the denial of post-conviction relief, the OCCA stated, "[a]s for Petitioner's claim that he was denied effective assistance of appellate counsel, the record does not support this claim." (Dkt. # 14-5 at 2). The OCCA also relied on Cartwright and concluded that "[f]ailure to raise each and every issue is not determinative of ineffective assistance of counsel and counsel is not required to advance every cause of argument regardless of merit." Id. This deviates from the controlling federal standard.

The Tenth Circuit has stated that the correct standard when analyzing ineffectiveness of appellate counsel requires courts to "look to the merits of the omitted issue." Cargle v. Mullin, 317 F.3d 1196, 1202-05 (10th Cir. 2003) (explaining that the merit of the omitted claim is the focus of the appellate ineffectiveness inquiry; omission of a sufficiently meritorious claim can, in itself, establish ineffective assistance; and thus, the state court's rejection of an appellate ineffectiveness claim on the basis of the legal premise invoked here is wrong as a matter of federal constitutional law). See also Malicoat v. Mullin, 426 F.3d 1241, 1248 (10th Cir. 2005) (following Cargle). Because the OCCA's analysis of Petitioner's allegations of ineffective assistance of appellate counsel deviated from the controlling federal standard, its analysis is not entitled to deference on habeas review. Cargle, 317 F.3d at 1205; see also Malicoat, 426 F.3d at 1248. Therefore, the Court will analyze Petitioner's claim of ineffective assistance of appellate counsel de novo.

Claims of ineffective assistance of counsel are governed by the two-pronged standard announced in Strickland. See United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995), abrogated on other grounds by Neill v. Gibson, 278 F.3d 1044 (10th Cir. 2001). When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the court first examines the merits of the omitted issue. Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999). The Tenth Circuit has explained that,

> [i]f the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

Cargle, 317 F.3d at 1202 (footnote omitted) (citation omitted); see also Parker v. Champion, 148 F.3d 1219, 1221 (10th Cir. 1998). The Supreme Court directs that to demonstrate ineffective assistance of appellate counsel, a petitioner must show that:

> [Appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the petitioner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

Smith v. Robbins, 528 U.S. 259, 285 (2000).

Petitioner complains that his appellate counsel failed to raise six grounds for relief on direct appeal.[3] (Dkt. # 1 at 39). He argues that "these issues are all significant and obvious issues." Id.

_____

[3]In Petitioner's reply, he makes a broad statement that his appellate counsel was the cause for failure to raise claims on direct appeal. (Dkt. # 17 at 9). However, in his habeas petition, Petitioner states that ineffective appellate counsel was cause for failing to raise Grounds I, II, III, VI, VII, and VIII on direct appeal. Petitioner failed to include Ground X. Thus, the Court will not consider whether appellate counsel provided ineffective assistance in omitting Ground X.

The six grounds for relief are Grounds I, II, III, VI, VII, and VIII.  Id.  For reasons previously stated,

the Court will examine the merits of these underlying claims de novo.

> ### a.    Expert witness misinformed the jury as to the correct law (Ground I)

Petitioner claims that his appellate counsel should have raised the issue that the State's

accident reconstructionist "misinformed [the jury]. . . as to the law in the State of Oklahoma" when

he testified that "the car in which the deceased was a passenger had a right to finish its left turn in

front of oncoming traffic."  Id. at 11.  Petitioner argues that this testimony "invaded the province of

the jury."  Id.  Petitioner then argues that this raises "four separate sub-issues," as follows:

> (1)    the trial court erred in overruling counsel's objections to the opinions as they were not reliable and not in accordance with Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . and the trial court should have exercised its gate keeping authority to keep these unreliable opinions from Officer Chism out of evidence, . . .
>
> (2)    as a result of allowing the jurors to hear Officer Chism's opinions the jury was entirely misinformed about Oklahoma law, depriving [Petitioner] of his right to due process and jury trial as guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution, . . .
>
> (3)    counsel was not supplied the opinions of witness Chism prior to trial and this was a clear cut discovery violation, . . .
>
> (4)    [Officer Chism's accident reconstruction] reports were never turned over to [Petitioner]'s attorney and inasmuch as they would have been exculpatory, it was clearly required to be provided by Title 22 O.S.§2002(2)(c).

(Dkt. # 1 at 13, 14, 16, 17).

The State's accident reconstructionist was Tulsa Police Officer Douglas Chism (Chism).

Chism's testimony was based on his seven years of experience, training, and expertise in working

traffic collisions and as a "crash reconstructionist."  See Dkt. # 16-8, Tr. Vol. III at 699-702.  The

majority of Chism's testimony centered on diagrams illustrating the locations of the vehicles leading

up to the collision, at the point of impact, and when they came to rest.  These diagrams were based on Chism's interviews with the witnesses and measurements taken at the scene.[4] Id. at 701-02, 703, 706-07.  Chism also testified as to steps taken at the scene to preserve DNA evidence on the air bag of Petitioner's truck, id. at 711-12, and the collection of data from the black box in Petitioner's truck, id. at 713-16.

Near the end of Chism's direct testimony, he was asked, "What is his [McGrew's] obligation, now that he's in the intersection wanting to make a left-hand turn, once the light turns red?" Id. at 717.  Petitioner's counsel immediately objected, stating that the "witness is not qualified to tell us what the law is." Id.  The trial court said that it was the responsibility of Chism to know what the law is and allowed him to answer, if Chism did in fact know.  The following exchange then occurred,

Q:    What's vehicle number two's[5] obligation in that intersection?

A:    If you enter the light on green, legally, and before you can make your turn safely it turns to red, you have an obligation to complete your turn to clear the vehicles going westbound.

Q:    Does he have an obligation to clear this intersection?

A:    Yes.

Q:    As he has an obligation to clear this intersection, what do all of these other vehicles have an obligation to do as he clears this intersection?

---

[4]Officer Chism created two sets of the accident diagrams.  The first diagrams were incorrect because Chism received wrong information from police officers at the scene as to the direction of travel of the vehicles involved in the collision.  Once Chism was made aware of this error, he personally interviewed the witnesses and created a second set of diagrams accurately depicting the location of the vehicles.  (Dkt. # 16-8, Tr. Vol. III at 704-709).

[5]On Chism's diagrams, Petitioner's vehicle was number one and McGrew's was number two. See Dkt. # 16-2, St. Ex. at 3.

> A:       Well, first off, . . . southbound vehicles have an obligation to stop for the red light.
> The vehicles going west have an obligation at the green light to be sure that it's clear
> for them to enter the intersection on the green light.

Id. at 717-18.

Petitioner argues that Chism's testimony, as to the obligation to clear the intersection, is not a correct statement of Oklahoma law.  Citing OKLA. STAT. tit. 47, § 11-402, Petitioner states that the statute provides that "the driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to any vehicle approaching from the opposite direction.  Nothing in the law changes this once the light turns yellow or to red."[6]  (Dkt. # 1 at 12-13).  Petitioner also argues that "had [his] counsel been properly informed of the expert witness's intended false opinions he could have prepared his own expert testimony but was instead ambushed and left with no countering testimony."  Id. at 13.  As discussed above, he also identifies four separate sub-issues.  For the reasons discussed below, the Court finds none of the four sub-issues is meritorious.

### i.       Reliability of expert testimony and opinion

Petitioner claims the trial court lapsed in its duty as a gatekeeper by failing to "keep these unreliable opinions from Officer Chism out of evidence."  (Dkt. # 1 at 13).  Petitioner argues that because the jury was misinformed "about issues and law and receive[d] unreliable opinions about causation[,] the entire process [was] so fundamentally flawed and unreliable as to deprive [Petitioner] of due process."  Id. at 14.  Respondent counters, stating that Petitioner "overlooks" the fact that he ran a red light when he "[struck] the car the victim was riding in" and that "Officer Chism testified, correctly, that Petitioner had an obligation to stop at the red light."  (Dkt. # 14 at

---

[6]OKLA. STAT. tit. 47, § 11-402 reads, as follows: "[t]he driver of a vehicle intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close thereto when initiating such turn as to constitute an immediate hazard."

24).  Respondent further argues that admission of the expert testimony was within the discretion of the trial court and that the "testimony did not tell the jury what result to reach or that the Petitioner was guilty."  Id. at 24-25.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the United States Supreme Court stated that, under Fed. R. Evid. 702, a trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Daubert, 509 U.S. at 589.  Rule 702, Federal Rules of Evidence, reads, "if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," an expert may testify thereto.  "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  Daubert, 509 U.S. at 592.  Further, the Supreme Court, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), stated that "the Rule's word 'knowledge,' not the words (like 'scientific') that modify that word, . . . 'establishes a standard of evidentiary reliability.'"  Id. at 147.

When a trial court is faced with expert testimony, it "must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  Daubert, 509 U.S. at 592.  Similarly, in Oklahoma,

> Expert testimony, opinion or otherwise, is admissible when it will 'assist the trier of fact to understand the evidence or to determine a fact in issue . . . .' 12 O.S.2001, § 2702.  Expert opinion is inadmissible where it merely tells the jury what result to reach, Romano v. State, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109 (Okla. Crim. App. 1995), but is not objectionable merely because it embraces an ultimate issue to be decided by the jury. 12 O.S.2001, § 2704; Johnson v. State, 2004 OK CR 25, ¶ 16, 95 P.3d 1099, 1104 (Okla. Crim. App. 2004).  Admission of expert testimony according to these controlling principles is within the trial court's discretion. Davis v. State, 2004 OK CR 36, ¶ 30, 103 P.3d 70, 79 (Okla. Crim. App. 2004).

Ball v. State, 173 P.3d 81, 86 (Okla. Crim. App. 2007).  Under Oklahoma law, "expert witnesses can suggest the inference which jurors should draw from the application of specialized knowledge to the facts." Romano, 909 P.2d at 109; see also Warner v. State, 144 P.3d 838, 860 (Okla. Crim. App. 2006) (quoting Romano).  "Expert opinion testimony . . . can be provided only by a witness who is 'qualified as an expert,' in the field at issue, 'by knowledge, skill, experience, training, or education.'" Malone v. State, 168 P.3d 185, 217 (Okla. Crim. App. 2007) (internal citations omitted).  The trial court correctly determined that Chism possessed the knowledge, training, and experience necessary to qualify as an expert witness.  Nothing in the record suggests that this determination was an abuse of discretion.

The Tenth Circuit has stated, however, that the party offering the expert opinion "need not prove that the expert is undisputably correct or that the expert's theory is generally accepted in the scientific community." Goebel v. Denver & Rio Grande W. R. Co., 346 F.3d 987, 991 (10th Cir. 2003) (internal citations and quotations omitted).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.  Thus, the party offering the expert testimony "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." Goebel, 346 F.3d at 991.

In support of the argument that Chism invaded the province of the jury, Petitioner cites Gabus v. Harvey, 678 P.2d 253 (Okla. 1984).  Ms. Gabus, a pedestrian struck by an automobile while crossing the street, brought a negligence action against the driver.  In Gabus, the Oklahoma Supreme Court concluded that the opinion testimony given by the investigating police officer as to

the cause of the accident,[7] invaded the province of the jury and reversed and remanded. The Oklahoma court concluded that the "testimony as to causation . . . did not assist the jury [because] [i]t concerned facts that could be readily appreciated by any person who drives an automobile or crosses the street." Id. at 256. The court cautioned that "[t]he vice of admitting such testimony is that it permits the jury to substitute the opinion of the officer for the combined judgment of the jury, encouraging a contest by experts rather than a trial by witnesses." Id. at 257  Thus, because the

---

[7]The pertinent testimony and rulings in Gabus were as follows:

> Q:    Officer, based upon all of the information that you gathered in order to formulate a report, information for an official report that you filed, did you also arrive at an opinion concerning right of way between the vehicle and the pedestrian?
>
> A:    I intend to have an opinion but no physical evidence, and without that there was no charges filed.
>
> Q:    I'm not asking about that. What is your opinion as to who yielded or who failed to yield the right of way?

MR. MONARD: I'm going to object to that.
THE COURT: Sustained as to the form of it. I'll let - come up here.
(At this time a brief off-the-record discussion was had outside the hearing of the jury.)

> Q:    (By Mr. Hendrickson) In your opinion, Officer-I withdraw the last question. In your opinion, Officer, how did this accident happen? What caused the accident to happen?
>
> A:    Okay. By the physical evidence and also by the statements that I had gotten from both drivers, Miss Gabus was crossing the street, whether she was walking or running, it was undetermined. But she was crossing the street, by her own statement walking. She advised me that she saw the vehicle approaching and thought it was approximately a block away at the time. The lighted conditions were dark. The fact that she had dark clothing on. I arrived at the opinion myself that she failed to yield the right of way to an oncoming vehicle.
>
> Q:    And was that the cause of the accident in your opinion?

MR. MONARD: Your Honor, I'm going to object to that.
THE COURT: He may state that.

> A:    It was an intruding factor, yes.

Gabus, 678 P.2d at 254, n.1 (emphasis added).

21

expert's conclusion "was not helpful," it should not have been admitted, id. at 256, and its effect upon the jury was "plainly prejudicial," id. at 257. The Oklahoma Supreme Court overturned the trial court's admission of the testimony, stating it was "a clearly erroneous conclusion and judgment, against reason and evidence." Id.

Here, the testimony of Chism is distinguishable from that given in Gabus. In Gabus, the officer specifically stated that "she[, the pedestrian,] failed to yield the right of way to an oncoming vehicle." Gabus, 678 P.2d at 254, n.1. Here, Chism explained that, in general, "[i]f you enter the light on green legally, and before you can make your turn safely, it turns red, you have an obligation to complete your turn to clear the vehicles going westbound." (Dkt. # 16-8, Tr. Vol. III at 717-18). He did not testify whether McGrew acted in compliance with his obligation. The Court finds this difference important. Chism properly testified concerning general traffic laws, but did not expressly state his opinion of the cause of the collision.

Additionally, Petitioner's defense counsel conducted a vigorous cross-examination, attacking Chism's opinion and providing an alternative option for the jury to consider. See Daubert, 509 U.S. at 596 (vigorous cross-examination is the traditional and appropriate means of attacking expert testimony). The exchange between Chism and defense counsel, in pertinent part, was as follows:

Q:      If, in fact, Mr. McGrew testified that the front of his car was at the intersection line but had not entered the intersection when the light turned red, what is your opinion of his obligations under the law at that point in time?

[objection by the State overruled] . . .

THE WITNESS:      Hypothetically, if he had not entered the intersection is what you're saying?

MR. SMALLWOOD: Yes, sir.

THE WITNESS:        If he had not entered the intersection and the light turns red, he is not obligated to turn.

Q:        (By Mr. Smallwood) He's obligated to stay put, is he not?

A:        If he's not entered the intersection.

(Dkt. # 16-8, Tr. Vol. III at 720-21).  Defense counsel also asked Chism if his testimony regarding the "obligation [] placed upon somebody entering an intersection when the light turns red" was in a police report prepared for this case.  Id. at 723.  Chism stated that his testimony was "just general traffic knowledge," and stated that he had not included this opinion in a police report, nor had he "rendered that opinion or given that testimony" in any other court appearance.  Id.

Finally, the court gave jury instructions on how to use and weigh expert testimony.  See Dkt. # 16-22, O.R. at 208.  Jury Instruction No. 21 reads, in full,

> Testimony has been introduced of certain witnesses who purport to be skilled in their line of endeavor or who possess peculiar knowledge acquired by study, observation, and practice.
> You may consider the testimony of these witnesses, and give it such weight and value as you think it should have, but the weight and value to be given their testimony is for you to determine.  You are not required to surrender your own judgment to that of any person testifying, based on that person's education, training or experience.  You need not give controlling effect to the opinion of such witnesses for their testimony, like that of any other witness, is to be received by you and given such weight and value as you deem it is entitled to receive.

Id.  This instruction allowed the jury to evaluate independently the testimony of Chism and to determine what weight, if any, to give its contents.

The Court concludes that the trial court did not fail in its role as gatekeeper.  Chism's testimony, when viewed in full, provided the jury with a more complete understanding of traffic laws for evaluating the facts of the case.  Petitioner was not denied due process in the admission of

23

the testimony because the testimony did not invade the province of the jury.  The Court finds that this underlying claim lacks merit.

## ii.        Improper jury instruction

Petitioner next claims that Chism's testimony served as an improper jury instruction because it misstated Oklahoma law.  (Dkt. # 1 at 14).  Petitioner argues that it has "long been held that habeas corpus relief can be granted if a general verdict rested on an instruction that defined a constitutionally defective alternative theory of criminal liability." Id. at 15 (citing Stromberg v. California, 283 U.S. 359 (1931)).  Petitioner further argues that the correct standard of review is found in Brecht v. Abrahamson, 507 U.S. 619 (1993), and that "allowing an officer to misinform the jury about a law which was the central focus of the trial had a substantial and injurious effect and influence on the jury's verdict."  (Dkt. # 1 at 16).

In Oklahoma, the court makes the determination "that the jury should be instructed on the subject." OKLA. STAT. tit. 12, § 577.2.; see also id. § 577.  However, courts have "recognize[d] that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.  Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988).  Further, under Oklahoma law, "expert witnesses can suggest the inference which jurors should draw from the application of specialized knowledge to the facts." Romano, 909 P.2d at 109.

Here, as discussed above, Chism offered his opinion and knowledge of traffic laws based on his expertise in this area.  His testimony suggested an "inference which jurors should draw from the application of specialized knowledge to the facts." See id.  Therefore, his testimony was properly

"called upon to aid the jury in understanding the facts in evidence even though reference to those facts [was] couched in legal terms."  See Specht, 853 F.2d at 809.  Notably, Petitioner did not request an instruction as to Oklahoma traffic laws, nor did the State.  Therefore, the opinion offered by Chism could not be said to have usurped the law set forth by the trial judge because none was given.  The Court finds no merit to the underlying claim.

### iii.     State's failure to produce expert reports in discovery

In his third and fourth sub-issues, Petitioner complains that he was not provided Chism's expert opinions prior to trial, nor was he provided the reports generated by the Vista FX software used in Chism's accident reconstruction.  (Dkt. # 1 at 16-17).  Petitioner argues that this resulted in his attorney being "blindsided" at trial, leaving Petitioner without "an adequate defense" and deprived of exculpatory evidence.  Id. at 17.  Petitioner admits, however, that "it is not clear that Officer Chism's opinions had ever been reduced to a written report."  Id.  Respondent argues that, based on the testimony at the preliminary hearing and the police report, there should have been no surprise on the part of Petitioner's trial counsel.  (Dkt. # 14 at 25).

"A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [State's] files."  Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987).  "There is [also] no general constitutional right to discovery in a criminal case, and Brady[ v. Maryland][8] did not create one . . . [and] the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded."  Weatherford v. Bursey, 429 U.S. 545, 559 (1977) (internal citation omitted).  Oklahoma's Criminal Discovery Code does require the State to

---

[8]Brady v. Maryland, 373 U.S. 83 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

disclose "any reports or statements made by experts in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons." OKLA. STAT. tit. 22, § 2002(A)(1)(d).  However, the Tenth Circuit has noted that Oklahoma law,

> does not require that everything to which an expert testifies be contained in the expert's report." Cf. Fed. R. Civ. P. 26(a)(2)(B) (requiring retained experts to prepare a report "contain[ing] a complete statement of all opinions to be expressed and the basis and reasons therefor"); Fed. R. Crim. P. 16(a)(1)(G) (at defendant's request, the government must provide a written summary of expert testimony to be used during its case-in-chief at trial).  In particular, the expert's report need not contain all the expert's ultimate conclusions. See, e.g., Pierce v. State, 786 P.2d 1255, 1262-63 (Okla. Crim. App. 1990).

 Cannon v. Mullin, 383 F.3d 1152, 1162 (10th Cir. 2004).

The record before the Court simply does not support Petitioner's claims.  While trial counsel objected to the legal opinion offered by Chism on the grounds that it was not supplied to him during discovery, see Dkt. # 16-8, Tr. Vol. III at 718-19, the record does not support Petitioner's complaint that trial counsel was "blindsided" by this testimony.  On cross-examination, defense counsel immediately addressed Chism's legal opinion, presenting Chism with a hypothetical scenario that resulted in a different obligation of McGrew at the intersection.  Id. at 720-21.  Further, counsel pressed Chism for the statutory citation relied on as the basis of his opinion, even going so far as to prompt Chism with the specific title in the Oklahoma Statutes.  See id. at 722.  Petitioner also readily admits that there is no indication that Chism's opinions were ever reduced to a written report.  (Dkt. # 1 at 17).  On cross examination, Petitioner's counsel asked whether Chism had written down his opinions in a report, to which Chism replied that he had not.  (Dkt. # 16-8, Tr. Vol. III at 723).

Further, the record shows that Petitioner did, in fact, have Chism's collision report.  During cross-examination, Petitioner's counsel produced the collision report as Defendant's Exhibits 1-A through 1-J.  Id. at 725.  That report included Chism's narrative of the collision, which reads, in part,

Jeffrey Underwood[, a witness,] stated that he was westbound on East Skelly Drive in the center lane.  First in line for the traffic signal.  He stated that Unit # 2 was in the intersection waiting to turn.  That his light (for westbound East Skelly Drive traffic) turned green as Unit # 2 was turning left.  Unit # 1 was southbound on South Lewis Avenue in the left lane, ran the red light, and struck the turning Unit #2.

I took [witness] Julie Tucker's statement at UDSW.  She stated that she was southbound on South Lewis Avenue in the right lane.  Her light turned yellow and she stopped.  She stated that Unit # 1 was in the left lane behind her.  She stated that Unit # 2 was in the intersection turning left.  Her light (for southbound South Lewis Avenue) turned red.  Unit # 1 ran the red light and struck the passenger side of the turning vehicle.

(Dkt. # 16-19, Def. Ex. 2-G).  Thus, Petitioner had Chism's report and had the information upon which Chism would base his testimony.

Finally, Chism testified at the preliminary hearing held on November 17, 2007, approximately ten months prior to Petitioner's trial.  (Dkt. # 16, Tr. Prelim. Hr'g Nov. 17, 2007 at 166).  At this hearing, Chism testified that he had used the Vista FX software to confirm that a crash was possible based on the data collected.  Id. at 176.  On cross-examination, Petitioner's counsel, who also represented Petitioner at trial, inquired about the accident report and the software.  Id. at 177-181.  Following this hearing, counsel submitted a motion for discovery, but did not make any specific requests for any reports generated by the software.  See Dkt. # 16-21, O.R. at 52.  The record also reflects that Petitioner received ongoing discovery disclosures from the State, id. at 85-87, and, that his counsel, made reciprocal discovery disclosures, id. at 88, 105.  Petitioner's counsel also filed several pre-trial motions – motion to quash, motions to suppress evidence, and motions in limine – none of which challenged the collision report or any report allegedly produced by the Vista FX software.  See generally Dkt. # 16-21.

The record shows that Petitioner's counsel was active during the pre-trial proceedings, was aware of the Vista FX software and its use by Chism.  Petitioner had full opportunity to make a

specific request for any report produced by the Vista FX software, if any existed. Petitioner has failed to show that a report from the Vista FX software did in fact exist and has also failed to show that he was denied discovery of any reports generated by Chism. Petitioner also fails to show his counsel was blindsided at trial. There is no merit to the underlying claim.

Thus, in light of a review of the entire record, there is no merit to the underlying sub-issues that Chism misinformed the jury as to the law, that the trial court failed in its gatekeeping role under Daubert, or that Petitioner was denied discovery of the expert reports. Thus, Petitioner failed to show that his appellate counsel was objectively unreasonable in failing to raise the issues regarding the expert testimony on appeal. See Kidwell v. Martin, 480 F. App'x 929, 933 (10th Cir. 2012) (unpublished).[9] Petitioner is not entitled to relief on this claim.

### b. Juror misconduct (Ground II)

Petitioner claims that his appellate counsel was ineffective for failing to raise the issue that juror misconduct deprived Petitioner of a fair and impartial jury. (Dkt. # 1 at 18). Petitioner states that "Juror Reeves told the other jurors that the night before [the jury was set to deliberate,] he had a car accident with a drinking driver." Id. Petitioner complains that even though Juror Reeves was excused for cause, the other jurors "were allowed to proceed into deliberation without objection [and] rendered a verdict of guilty and recommended a 24 [sic] year sentence for Manslaughter DUI and a 9 year sentence for Leaving the Scene." Id. This, argues Petitioner, shows that the "jurors were inflamed and prejudiced by Juror Reeves' statements as they recommended a very severe sentence." Id. Respondent argues that Petitioner fails to show he was prejudiced. (Dkt. # 14 at 27).

---

[9]This, and other unpublished decisions, are cited as persuasive authority, pursuant to Tenth Circuit Rule 32.1.

"The trial judge has broad discretion in ruling on the issue of prejudice resulting from extraneous information being read or heard by the jury concerning the trial." Wacoche v. State, 644 P.2d 568, 572 (Okla. Crim. App. 1982) (citing McDonald v. State, 553 P.2d 171 (Okla. Crim. App. 1976) (citing Marshall v. United States, 360 U.S. 310 (1959))). The OCCA "afford[s] the trial court's findings on factual issues great deference and will review its findings applying a deferential abuse of discretion standard." Young v. State, 12 P.3d 20, 48 (Okla. Crim. App. 2000); see also Matthews v. State, 45 P.3d 907, 912 (Okla. Crim. App. 2002). Oklahoma courts have

> enunciated . . . a distinction . . . between misconduct which occurs prior to submitting the case to the jury and misconduct which occurs after the jury has retired for deliberations. When the alleged misconduct occurs subsequent to the submission of the case to the jury, the misconduct is presumed to have prejudiced the defendant and it is incumbent upon the State to show that he was not prejudiced. However, where it appears that a juror converses with third parties during the trial and prior to deliberations, there must be a showing by the defendant that he was prejudiced.

Wacoche, 644 P.2d at 572 (citing Parks v. State, 457 P.2d 818 (Okla. Crim. App. 1969) (citing Townley v. State, 355 P.2d 420, 731 (Okla. Crim. App. 1960))). The OCCA has stated that when there is an issue with a juror that occurs prior to deliberations, "the proper procedure would [be] for the trial court to question [the juror] in chambers at the time the parties became aware of the situation. The trial court could properly question the juror whether any extraneous prejudicial information was brought to his attention." Wacoche, 644 P.2d at 573.

The OCCA's rulings conform with directives from the United States Supreme Court. The Court has stated that, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences

when they happen. Such determinations may properly be made at a hearing . . . ."  Id.  Justice

O'Connor noted, in her concurring opinion, that the majority opinion in Smith "does not foreclose

the use of 'implied bias' in appropriate circumstances."  Id. at 221 (O'Connor, J. concurring).

However, "[t]he implied bias doctrine should not be invoked lightly. It must be reserved for those

extreme and exceptional circumstances that leave serious question whether the trial court subjected

the defendant to manifestly unjust procedures resulting in a miscarriage of justice."  Gonzales v.

Thomas, 99 F.3d 978, 987 (10th Cir. 1996) (internal quotations and citations omitted).

      Here, the juror misconduct occurred prior to deliberations.  (Dkt. # 16-10, Tr. Vol. V at

1059).  Therefore, Petitioner has the burden to show he was prejudiced.  Following the conference

regarding jury instructions, the bailiff informed the trial court that Juror Reeves had been in an

automobile accident, was injured, and that there was some discussion about it among the jurors.  Id.

at 1059-60.  The court brought in Juror Reeves for questioning, out of the presence of the rest of the

jury, and learned that Juror Reeves had been hit by an elderly man who had alcohol on his breath,

id. at 1061, and Juror Reeves had injured his back to such an extent that it was "real uncomfortable"

to sit, id. at 1060.  Upon completion of the court's inquiry, and after Petitioner's counsel declined

to "move to strike for cause," the State moved to remove Juror Reeves for cause.  Id. at 1064.  The

court granted the State's motion.  Id. at 1066.

      The State then requested that the court examine the rest of the jurors and inquire into the

impact this information would have on the deliberations in Petitioner's case.  Id.  The court

proceeded to question the remaining jurors, one at a time, and allowed questioning by the parties.

See id. at 1066-97.  The court learned that all of the jurors had heard some discussion about the

accident, with five jurors learning about it from Juror Reeves, and the rest from other jurors.  All

jurors, however, indicated that the knowledge of Juror Reeves' accident would have no impact on their ability to deliberate and would consider only the facts presented at Petitioner's trial. See id. Neither the State nor Petitioner's counsel made a request to strike any of the remaining jurors. Id. at 1097.

The Court finds that the trial court did not abuse its discretion in dismissing Juror Reeves, in not dismissing any other jurors, nor in allowing the case to go to the jury after its inquiry. Further, Petitioner fails to show how he was prejudiced by the court's decision. Exercising an abundance of caution in order to ensure that Petitioner would receive a fair jury trial, the court properly conducted an individual voir dire of each juror. Petitioner merely states that "common sense would tell one that these jurors were in fact inflamed and prejudiced by one of their own having a wreck with a drinking driver during the course of the trial." (Dkt. # 1 at 19). Yet, Petitioner fails to support this statement or show that any juror harbored bias because "one of their own" had been injured by a drinking driver. In fact, the record shows that some jurors did not know Juror Reeves by name and only knew who he was after his clothing was described to them. Thus, Petitioner fails to show that he was prejudiced and fails to show that the trial court abused its discretion. There is no merit in this claim.

Also in Ground II of the petition, Petitioner briefly asserts that his trial "counsel did not move for a mistrial, [and] if this Court feels he should have objected in order to preserve the error then this failure would have constituted ineffective assistance of counsel." Id. at 20. Thus, Petitioner appears to argue that his appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel on direct appeal. Under Strickland v. Washington, a petitioner must demonstrate that his counsel's performance was deficient and that the deficient performance was

31

prejudicial. Strickland, 466 U.S. at 687. The Court has already concluded that Petitioner was not prejudiced by the trial court's rulings with regard to the jury. Petitioner fails to show that, given the circumstances, it was objectively unreasonable for Petitioner's counsel not to request a mistrial. Additionally, even had Petitioner shown counsel was objectively unreasonable in failing to move for a mistrial, Petitioner fails to show how he was prejudiced such failure. Petitioner's claim of ineffective assistance of trial counsel for failing to move for a mistrial lacks merit.

The Court finds there is no merit to the underlying claims in Ground II. Thus, Petitioner's claim of ineffective assistance of appellate counsel fails.

### c.      Miranda violation (Ground III)

Petitioner next complains that his appellate counsel was ineffective for omitting the issue that the trial court improperly allowed the testimony of two members of the Tulsa Police Department in violation of Petitioner's rights under Miranda v. Arizona, 384 U.S. 436 (1966).[10] (Dkt. # 1 at 20). Petitioner argues that portions of the testimony by Officer Stephanie Blann and Sergeant Richard Bondy included statements Petitioner made while "in custody" and without his Miranda warnings. Id. at 20-21. Respondent argues that the "statements were made spontaneously by the Petitioner or after advisement of Miranda rights." (Dkt. # 14 at 27). Alternatively, Respondent argues that "even if the statements were taken in violation of Miranda, . . . any error was harmless due to the overwhelming evidence of the Petitioner's guilt, including Petitioner's testimony at trial that he was driving his pickup in the crash and his admission that he had been drinking that night." Id. at 29.

---

[10]In Miranda, the Supreme Court found that statements made by a defendant during custodial interrogation could not be used at trial unless the defendant was first advised of his right to remain silent, his right to an attorney, and that his statements may be used against him.

Petitioner complains that a total of four statements, two made to Officer Blann and two made to Sergeant Bondy, were admitted in violation of <u>Miranda</u>. (Dkt. # 1 at 20-21). First, the trial court allowed Officer Blann to testify that when she arrived at the location where Officer Beauchamp found Petitioner behind a wall, she walked over to Petitioner and said, "[M]an, you vomited on yourself." (Dkt. # 16-8, Tr. Vol. III at 530). Over Petitioner's objection, she then testified that Petitioner said, "Yeah, I had a couple drinks." <u>Id.</u> at 532. Later in her testimony, Officer Blann testified that she asked Petitioner for several pieces of arrest and booking information while they were at OSU Medical Center having Petitioner's blood drawn. <u>Id.</u> at 562-63. The court allowed Officer Blann to testify, again over Petitioner's objections, as to Petitioner's responses to those questions. <u>Id.</u> at 563-65.

Sergeant Bondy talked to Petitioner at the "main police station" where Petitioner was in a holding area. <u>Id.</u> at 658-59. Sergeant Bondy testified that he "was led to believe that [Petitioner] was an attorney." <u>Id.</u> at 663. Over multiple objections by Petitioner's counsel, Sergeant Bondy testified that Petitioner said he was an attorney in response to a question about his education level. <u>Id.</u> at 664. He further testified that when he asked Petitioner for his bar number, Petitioner said he did not have one, that the he "just sue[d] people." <u>Id.</u> at 665. Next, when Sergeant Bondy and the State were attempting to sort out the timing of Petitioner's statements and Sergeant Bondy's questioning, Sergeant Bondy was asked, "Sergeant Bondy, so you asked him, 'Are you and attorney?' What's his response?" <u>Id.</u> at 668. Sergeant Bondy answered, "He said, 'I tell you what, I'm going to go ahead and waive all rights here. I'll push forward to legal counsel.'" <u>Id.</u> When asked to clarify his statement, Petitioner told Sergeant Bondy, "I'll tell you what, I'll waive forward anything I say can be used against me, however I'm not going to say anything. By pushing forward

to counsel, wait, there's a double negative there, a double positive." Id. at 668-69.  Sergeant Bondy stopped questioning Petitioner, but remained at the table outside the holding area, working on Petitioner's arrest report.  Id. at 670.  Then, the following exchange between the prosecutor and Sergeant Bondy took place:

> Q:    (Mr. Berlin) You're working on your arrest report.  At some point does the defendant make a statement?
>
> A:    (Sergeant Bondy)  Yes.
>
> Q:    What is that statement?
>
> A:    He asked me what happened.
>
> Q:    And in response to that, sir, what did you say?
>
> A:    I asked him if he was talking to me.
>
> Q:    Did he respond to that, sir?
>
> [Objection by Petitioner sustained]
>
> Q:    Did you make any other statements to the defendant, sir?
>
> A:    Yes, I did.
>
> Q:    And what was that?
>
> [Objection by Petitioner overruled]
>
> A:    I pointed out that his car was present.

Id. at 672-73.

When analyzing a claim that the testimony of a police officer violates a petitioner's protections under Miranda, the court must first determine whether Miranda protections apply.

For <u>Miranda</u>'s protections to apply, 'custodial interrogation must be imminent or presently occurring.' <u>United States v. Rambo</u>, 365 F.3d 906, 909 (10th Cir. 2004). <u>Miranda</u> is therefore only applicable when (1) the suspect is in 'custody,' and (2) any 'questioning [ ] meet[s] the legal definition of interrogation.' <u>United States v. Benard</u>, 680 F.3d 1206, 1211 (10th Cir. 2012) (quotations omitted). To be in custody, a person must be under formal arrest or have 'his freedom of action . . . curtailed to a degree associated with formal arrest.' <u>Id.</u> (quotations omitted).

'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.' <u>Fox v. Ward</u>, 200 F.3d 1286, 1298 (10th Cir. 2000). Rather, 'interrogation' refers to 'either express questioning or its functional equivalent' – i.e., 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L.Ed.2d 297 (1980).

<u>United States v. Cash</u>, 733 F.3d 1264, 1276-77 (10th Cir. 2013).  Thus, the Court must determine whether, at the time of the statements made by Petitioner, there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995) (internal citations omitted).  If so, then the Court must determine "whether law enforcement officials should have known that their words or actions – whether framed as a question or not – were reasonably likely to elicit an incriminating statement." <u>Cash</u>, 733 F.3d at 1277.

After a careful review of the record, the Court concludes that Petitioner was "in custody" for purposes of <u>Miranda</u> when he made all four of statements cited above.  It was objectively clear that in each situation, Petitioner's "freedom of action was curtailed to a degree associated with arrest," <u>see</u> <u>Benard</u>, 680 F.3d at 1211, or he was under arrest and "in custody" for purposes of <u>Miranda</u>.

First, the statement to Officer Blann that he "had a couple of drinks," was made when Petitioner may

35

have been in handcuffs,[11] was surrounded by an unknown number of police officers and police cars, and had given his Oklahoma driver's license to Officer Beauchamp.  (Dkt. # 16-8, Tr. Vol. III at 493-94, 528).  At the very least, these circumstances show that Petitioner's freedom of movement was severely restricted.  Petitioner's refusal to supply biographical information to Officer Blann occurred after Petitioner was placed under arrest and while he was at OSU Medical Center for a legal blood draw.  Id. at 562-63.  Petitioner was under arrest; thus, he was "in custody."  The questioning by Sergeant Bondy occurred in a holding area of the main Tulsa Police Station after Petitioner was placed under arrest.  Id. at 658-59.

Having concluded that Petitioner was "in custody," the Court must determine whether the questioning by the Tulsa Police meets the definition of interrogation.  Two situations plainly do not – the biographical questions from Officer Blann for purposes of booking information and the question posed by Sergeant Bondy as to Petitioner's level of education.  While "police may not ask questions, even during booking, that are designed to elicit incriminatory testimony," Pennsylvania

---

[11]There was conflicting testimony as to whether Petitioner was in handcuffs when Officer Blann arrived at Officer Beauchamp's location.  Officer Beauchamp, the arresting officer, testified that as he "was running [Petitioner's] name, they came back on the radio and said that the tag on the vehicle checked back to Mr. Bushyhead, so at that time I went ahead and put him in handcuffs and put him in my police car."  (Dkt. # 16-8, Tr. Vol. III at 494).  Officer Beauchamp testified that this happened as "[o]ther officers were arriving on the scene."  Id. at 493.  He also testified that he could not remember whether he had Petitioner in handcuffs before any other officers arrived on the scene. Id. at 508.  Officer Blann testified that when she arrived at the location, Officer Beauchamp and Petitioner were standing "[i]n the general area."  Id. at 529.

At the preliminary hearing held on November 15, 2007, Officer Beauchamp testified that he "placed [Petitioner] in handcuffs and he was under arrest at this point. . . . Other officers responded to the scene and said that the tag on the vehicle checked back to Mr. Bushyhead, was [sic] who I had in custody."  (Dkt. # 16, Tr. Prelim. Hr'g at 110-11).  Officer Blann testified that when she initially found Petitioner with Beauchamp he was not under arrest nor was he in handcuffs.  Id. at 140. Petitioner's counsel objected and the court permitted counsel to voir dire the witness.  During the voir dire, Officer Blann stated that she did not know exactly when Petitioner was placed in cuffs and that she did "not recall him being in handcuffs when [she] was speaking with him."  Id. at 143.

36

v. Muniz, 496 U.S. 582, 602, n.14 (1990), questions regarding normal biographical information that are routine booking questions do not constitute interrogation.  United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993); see also United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986) (questions of employment fall within the benign category of basic identifying data required for booking and arraignment).  Here, Officer Blann asked Petitioner to identify his employer, his employer's address, his next of kin, and the street address for his next of kin.  (Dkt. # 16-8, Tr. Vol. III at 563-64).  Petitioner refused to answer, except to say that Bo Bushyhead, his father, was his next of kin.  Id. at 564.  Similarly, Sergeant Bondy asked Petitioner his level of education for purposes of completing the waiver of rights form prior to questioning Petitioner at the Tulsa Police Station.  Id. at 663-64.  Neither of these two lines of questioning was designed to elicit an incriminating response.  Each was for a purpose of collecting biographical information to complete police paperwork.  Thus, Miranda protections do not apply to these two pieces of testimony.

Although the sequence of events at the police station was unclear, id. at 667, Sergeant Bondy eventually testified that he read Petitioner his Miranda rights after the exchange that resulted in Petitioner stating he was an attorney and that he "just sue[d] people."  Id. at 669.  Thus, when Petitioner asked Sergeant Bondy about what had happened, Petitioner had been read his Miranda rights and Sergeant Bondy had already stopped questioning Petitioner.  After a defendant has invoked his rights under Miranda,

> police may not attempt to continue questioning the suspect unless: (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of Miranda warnings; and (4) the subject of the second interrogation [is] unrelated to the first.

United States v. Santistevan, 701 F.3d 1289, 1295-96 (10th Cir. 2012) (quoting Michigan v. Mosley, 423 U.S. 96, 104-05 (1975)). However, a defendant who has previously invoked right to counsel may change his mind so long as it is defendant who reinitiates further discussions, and he knowingly and intelligently waived the right he had invoked. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); Santistevan, 701 F.3d at 1294 (quoting Smith v. Illinois, 469 U.S. 91, 95 (1984)).

Here, Sergeant Bondy testified that he had stopped questioning Petitioner and that it was Petitioner who resumed communications. (Dkt. # 16-8, Tr. Vol. III at 670-72). Though Miranda warnings had been given and there appeared to be an understanding that Petitioner had asserted his rights, it was Petitioner who reinitiated the conversation with Sergeant Bondy. As a result, Miranda protections do not apply. Edwards, 451 U.S. at 484-85. Further, the trial court, in a proper exercise of discretion, limited the testimony of Sergeant Bondy to the single question from Petitioner and two responses from Sergeant Bondy.

Finally, the Court finds that, based on the circumstances, Miranda protections did apply to Petitioner's statement to Officer Blann that he had a couple of drinks. Officer Blann testified that as she approached Petitioner, she observed that "he had slurred speech, was unsteady on his feet, obviously he had vomited on himself[,] . . . smelled strongly of alcohol on his breath and person, and . . . he had bloodshot eyes." (Dkt. # 16-8, Tr. Vol. III at 529-30). All of these observations were factors that, based on her training, indicated to her that Petitioner was under the influence of alcohol. Id. at 529. Given the context of the encounter, Officer Blann's statement to Petitioner, "man, you vomited on yourself," leads the Court to conclude that Officer Blann should have known that her statement was reasonably likely to elicit an incriminating response. See Innis, 446 U.S. at 301. Miranda applied to Petitioner's statements made during this encounter.

Erroneous admission of evidence in violation of <u>Miranda</u> is subject to harmless error review. <u>Arizona v. Fulminate</u>, 499 U.S. 279, 306-07 (1991); <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993). "In deciding whether the error is harmless the relevant question is whether the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Ramos v. Shillinger</u>, 1995 WL 640386, at *5 (10th Cir. Oct. 23, 1995) (unpublished) (quoting <u>Brecht</u>, 507 U.S. at 623). The Court concludes it did not. Eyewitnesses testified that Petitioner ran a red light at the intersection and fled the scene on foot. Additionally, other Tulsa Police officers and the nurse at the hospital who drew Petitioner's blood, testified that Petitioner smelled of alcohol, both on his breath and person. Also, Petitioner testified that he had consumed four drinks prior to the collision. Finally, Petitioner's blood alcohol level was 0.24. The erroneous admission of Petitioner's statement to Officer Blann was harmless error in light of the additional evidence presented against Petitioner at trial.

Therefore, having found no merit in Petitioner's claim of <u>Miranda</u> violations, Petitioner fails to show ineffective assistance of appellate counsel for failure to raise this claim on direct appeal.

### d. Challenges to the blood alcohol testing procedure and chain of custody (Ground VI)

Next, Petitioner claims that appellate counsel was ineffective for failure to raise on appeal that there were errors in the legal blood draw and flaws in the chain of custody. (Dkt. # 1 at 30). As a result of these errors, Petitioner argues that "the blood alcohol test should have been suppressed as not reliable and the failure to suppress so infected the trial and its results as to constitute structural error . . . depriving Petitioner of his fundamental right to a jury trial." <u>Id.</u> at 34. Respondent argues that Petitioner failed "to show that the blood test was improperly drawn . . . and any objections to the chain of custody goes to the weight of the evidence rather than admissibility." (Dkt. # 14 at 32).

Respondent further argues that Petitioner fails to show how he was prejudiced by appellate counsel's failure to raise the issue.  Id.

The legal blood draw and the chain of custody of the blood were the topics of a lengthy hearing on a motion to suppress and consumed a large part of the trial itself.  See Dkt. # 16-2, Tr. Hr'g May 29, 2008; Dkt. # 16-8, Tr. Vol. III; Dkt. # 16-9, Tr. Vol. IV.  A total of ten witnesses testified at the motion to suppress hearing and nine testified at the trial regarding the collection of the blood and chain of custody issues.  Id.  This included Petitioner's own expert witness, a forensic toxicologist and expert on chain of custody issues, Gary H. Wimbish, Ph.D.  (Dkt. # 16-2, Tr. Hr'g May 29, 2008 at 231; Dkt. # 16-9, Tr. Vol. IV at 922).  Petitioner's challenges to the blood test stem from his belief that "[n]owhere in the trial record was there evidence that [Petitioner] was that intoxicated."  (Dkt. # 1 at 30).  Petitioner's blood alcohol level was 0.24.  Petitioner argues that the nurse was inexperienced "in drawing and preserving blood samples for testing," id. at 31, and that Dr. Wimbish identified three areas of concern regarding the blood test, id. at 32.  The three areas identified were: (1) "Nurse Morris did not invert the collection vials five times which violated the protocol," id.; (2) the chain of custody "was not sufficiently demonstrated," id. at 33; and (3) "there was no adequate chain of custody during the process of testing the samples," id.

In Oklahoma, it is the responsibility of the State to show that "in reasonable probability," the evidence is reliable and "has not been changed in any important aspect."  Driskell v. State, 659 P.2d 343, 354 (Okla. Crim. App. 1983).  "The trial judge's determination will not be overturned unless there is a clear abuse of discretion."  Id.  The OCCA has explained that:

> The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed. Alverson v. State, 1999 OK CR 21, ¶ 22, 983 P.2d 498, 509. Although the State has the burden of showing the evidence is in substantially the same condition at the time

of offering as when the crime was committed, it is not necessary that all possibility of alteration be negated. Id. If there is only speculation that tampering or alteration occurred, it is proper to admit the evidence and allow any doubt to go to its weight rather than its admissibility. Id.

Mitchell v. State, 235 P.3d 640, 657-58 (Okla. Crim. App. 2010).

Upon review of the considerable record on the chain of custody issue, the Court finds that the trial court did not abuse its discretion in admitting the blood alcohol test results. In determining that there was no issue with the collection of the blood, the trial court stated,

> One of the things that I think influenced me in listening to the testimony yesterday was that there wasn't anything before me to indicate that anybody had told Nurse Morris that the tubes had pink and white powder in them and he testified from the stand that they did and he saw it, and mixed until he couldn't see it anymore.
> And Mr. Carter from the OSBI had indicated that it would be visible. And the fact that he, unprompted and not asked that question, said that it was in there and he saw it was persuasive to the Court in that one respect.

(Dkt. # 16-3, Tr. Hr'g May 30, 2008 at 23-24). The court further noted that assertions by Petitioner's expert witness had been adequately addressed or explained in the course of the testimony. The court stated,

> [Dr. Wimbish] indicated that he has respect for the ASCLD, which is a national organization that certifies labs as having appropriate protocol. And he – we had the testimony that the OSBI Lab was certified and had remained certified for a number of years and he did say he had respect for that organization.
> He did indicate that there were other things that could have been done with more frequent checks and more peer review.
> . . .
> The method that was used by OSBI, as well as the Tulsa Police Department, was a computer-generated sheet rather than a paper sheet and Dr. Wimbish indicated that he thought that the paper sheet would have been more helpful in establishing the chain of custody.
> Dr. Wimbish further indicated that the correct tubes were used to collect the blood. He had originally heard a different color on the top of the tubes and he had concerns about that, but when he saw the pictures, he saw that the top was gray or grayish-blue and that was the appropriate color. And he did say that the appropriate protocol was used with regard to the sheet of instructions that accompanied the blood kit and it was the same that's used across the United States.

41

He did not feel like the error in the property receipt had been properly explained to him.[12]  But I have today found that the witness did not prepare that number and neither did a lab.  It was prepared by the district attorney's office and they'll have to face the music on that.

Id. at 22-23.  The court overruled Petitioner's motion to suppress the results as unreliable and overruled a motion to suppress for lack of appropriate or reliable chain of custody.  Id. at 25.  Under the facts of this case, there was no abuse of discretion.

As to his challenge to the blood alcohol test, Petitioner offers only speculation that the blood alcohol test was flawed because "it would have taken a lot more than 4 drinks over the relevant period of time for a man weighing over 235 pounds to register a .24 blood alcohol level."  (Dkt. # 1 at 31).   However, doubts about the credibility go to the weight of the evidence, not its admissibility.  See Alverson, 983 P.2d at 509.  Further, Petitioner fails to show that Nurse Morris improperly drew the blood.  Nurse Morris testified that, while it was his first legal blood draw, he had been a nurse for 20 years and had "drawn blood on at least a couple thousand patients in the last 20 years." (Dkt. # 16-9, Tr. Vol. IV at 761).  While Petitioner's counsel attempted to impeach Nurse Morris, pointing out that his testimony at trial was different from that given at the preliminary hearing on the subject of mixing the vials, Nurse Morris testified that it is a "given fact" that "you've

---

[12]In his report, Dr. Wimbish stated that, "[t]he blood sample collected from [Petitioner] was identified as T.P.D. property receipt # BB-6364 as evidence item # 1 when placed in a lock-box located within a refrigerator within the Property Room at T.P.D. H.D.S.W. on 03/09/07 at 02:04 hours.  Between 09:00 and 10:00 hours on 03/09/07, Officer Waller scanned the barcode listed on the blood-kit as T.P.D. Property Receipt BB-6363.  **THIS IS NOT THE SAME BARCODE AS IDENTIFIED ABOVE!**  This is a fatal error."  (Dkt. # 16-21, O.R. at 90-91).

This misidentification of the blood sample as # BB-6363 occurred in a memorandum to Steve Kunzweiler from C. Folks.  (Dkt. # 16-2 at 241-42; Dkt. # 16-9, Tr. Vol. IV at 972-74).  The State showed that it appeared this error occurred in writing of the memorandum and not in the TPD property room.  (Dkt. # 16-9, Tr. Vol. IV at 974-78).  Dr. Wimbish testified that he did not consider this information part of the chain of custody.  Id. at 979.

got to mix the blood" after you draw the blood.  Id. at 788.  Petitioner fails to show more than speculation.

The Court finds that the trial court did not abuse its discretion in admitting the blood alcohol results into evidence.  There is no merit to the underlying claim.  Petitioner has failed to show appellate counsel was ineffective for failing to raise this claim on appeal.

### e.    Right to seek independent blood test (Ground VII)

Petitioner argues that his appellate counsel was ineffective for failing to raise the issue that Petitioner was "deprived of [his] due process right to have blood alcohol sample independently tested as a result of the delay in providing him the blood test results and charging him with manslaughter DUI."  (Dkt. # 1 at 35).  Petitioner argues that "[i]t is not uncommon in the State of Oklahoma for this type of problem to happen and the State of Oklahoma should be estopped from proceeding in such cases and the blood test results not admitted into evidence."  Id.  Respondent argues this claim is without merit because Petitioner knew his blood had been drawn and he "could have requested an independent test within 60 days under Okla. Stat. tit. 47 O.S. § 752."  (Dkt. # 14 at 32-33).  Respondent further argues that Petitioner "simply did not request" an independent test in a timely manner, not that he was denied one.  Id. at 33.

Under Oklahoma law, an individual, who has his blood drawn for purposes of determining his blood alcohol level, can request a sample of that blood and have it tested by another laboratory. The applicable statute reads as follows:

> When blood is withdrawn or saliva or urine is collected for testing of its alcohol concentration or other intoxicating substance presence or concentration, at the request of a law enforcement officer, a sufficient quantity of the same specimen shall be obtained to enable the tested person, at his or her own option and expense, to have an independent analysis made of such specimen. The excess blood, saliva or urine specimen shall be retained by a laboratory approved by the Board, in accordance

with the rules and regulations of the Board, or by a laboratory that is exempt from the Board rules pursuant to Section 759 of this title, for sixty (60) days from the date of collection. <u>At any time within that period, the tested person or his or her attorney may direct that such blood, saliva or urine specimen be sent or delivered to a laboratory of his or her own choosing and approved by the Board for an independent analysis.</u> Neither the tested person, nor any agent of such person, shall have access to the additional blood, saliva or urine specimen prior to the completion of the independent analysis, except the analyst performing the independent analysis and agents of the analyst.

OKLA. STAT. tit. 47, § 752(E) (emphasis added). Oklahoma courts have interpreted this statute to state that "[t]he burden is clearly placed upon the subject to comply with each condition, or any independent test results are inadmissible at trial." <u>Foy v. State</u>, 533 P.2d 634, 637 (Okla. Crim. App. 1974); <u>see</u> <u>also</u> <u>Craig v. State</u>, 818 P.2d 1244, 1246 (Okla. Crim. App. 1991) ("The underlying purpose of Section 752(4) [now 752(E)] is to ensure that the person whose blood is drawn may obtain, upon his request and within certain time constraints, an independent analysis of his blood."). A defendant has the opportunity to obtain an independent analysis, but his failure or inability to do so does not affect the admissibility of the State's results. <u>Foy</u>, 533 P.2d at 637.

The Court finds that Petitioner's claim has no merit. The record shows that Petitioner knew his blood was drawn after the collision and he consented to the blood draw. <u>See</u> Dkt. # 16-9, Tr. Vol. IV at 1009. The record also shows that Petitioner retained his trial counsel as early as April 23, 2007, when a search warrant was executed for a buccal swab from Petitioner at counsel's office. (Dkt. # 16-8, Tr. Vol. III at 679-80). The warrant was executed within seven weeks of March 8, 2007, the date of the collision, and approximately 46 days from when Petitioner's blood was drawn. Petitioner had another fourteen days to request a blood sample. The record does not show, nor does Petitioner appear to argue, that Petitioner was denied access to the blood sample or told that he could not have a sample for his own testing.

44

Petitioner argues that he "was not aware of the test results until after the 60 day time period had already expired and therefore he was not able to have the specimen independently tested." (Dkt. # 1 at 35).  However, Petitioner fails to cite any authority or point to language in the statute that shows that a defendant must wait until the State's results are disclosed before requesting a blood sample be sent to another laboratory for independent testing.  The statutory language cited above is clear.  The defendant bears the burden of insuring independent blood analysis within the 60-day time period.  Petitioner's claim lacks merit.

Having found no merit in the underlying claim, the Court finds that appellate counsel did not provide ineffective assistance in failing to raise this claim on direct appeal.

### f.      Failure to provide exculpatory evidence (Ground VIII)

Finally, Petitioner claims that his appellate counsel was ineffective for failing to raise the claim in Ground VIII, that the State's "failure to provide copies of possible exculpatory evidence to Petitioner deprived him of due process." (Dkt. # 1 at 36).  Petitioner is referring to two items of evidence – recordings of interviews by Sergeant Bondy with Petitioner and McGrew, and the blood alcohol test of McGrew.  Id.  Petitioner claims that these pieces of evidence may have been exculpatory, but "now we will never know." Id.  Respondent argues that while the recordings could not be located, "Officer Bondy's recollection of the interview revealed no exculpatory evidence that was not disclosed to the Petitioner." (Dkt. # 14 at 33).  Respondent also argues that the "blood alcohol test of the other driver was irrelevant as the evidence at trial proved the crash was caused by Petitioner running the red light." Id.

The United States Supreme Court has stated that the prosecutor has a duty to disclose evidence favorable to an accused "even though there has been no request by the accused, and that

45

the duty encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing Brady, 373 U.S. at 87; United States v. Agurs, 427 U.S. 97, 107 (1976); United States v. Bagley, 473 U.S. 667, 676 (1985)). "Such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. . . . [A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678. The stated test for materiality of suppressed evidence is that,

> [t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

Bagley, 473 U.S. at 682. In Brady, the Supreme Court held that suppression by the State "of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." Brady, 373 U.S. at 87.

The possible existence of the interview recordings by Sergeant Bondy was not known by the State or Petitioner until Sergeant Bondy's testimony during a Jackson v. Denno[13] hearing on September 12, 2008, the Friday before Petitioner's trial was to begin. (Dkt. # 16-5, Tr. Hr'g Sept. 12, 2008). During his testimony, Sergeant Bondy testified that he recalled recording the interview between himself and Petitioner. Id. at 25. He also testified that, at the time of the hearing, the recordings had been lost, destroyed, or could not be found. Id. at 48.

---

[13]Jackson v. Denno, 378 U.S. 368, 376 (1964) ("A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined.").

While both Petitioner and Respondent continue to assert the recordings do not exist, the record disputes the parties' assertions.  On the Monday morning following Sergeant Bondy's testimony, the first day of Petitioner's trial, the trial court held a hearing on the matter of the recordings. (Dkt. # 16-6, Tr. Vol. I at 7).  At the hearing, the court stated, "[t]he Court was advised after the hearing that Officer Bondy had gone over to the police department and tried again to locate . . . the recordings which had been . . . transferred from a digital recorder to a server, and no one had been able to find them."  Id.  The State then informed the court that Sergeant Bondy spoke with someone in the "IT department of the City of Tulsa" and "[Sergeant Bondy] was able to identify the case number assigned to this particular case, as well as a file I believe with his name on it.  He had indicated to me that he believed there may be three recordings on there."  Id. at 8.  The prosecutor further stated that Sergeant Bondy thought the three recordings included the interview with Petitioner and an interview with McGrew.  Id.  Ultimately, the State notified the court and Petitioner that copies of the recordings would likely be available on Tuesday morning because of the time required to copy the files off of "memory tape."  Id. at 9.  The court, the State, and Petitioner all agreed to move forward with jury selection.  Id. at 13, 15.  The next morning, the State announced that earlier that morning, it received a copy of a CD that included three conversations – one with McGrew, one with Petitioner, and a third suspected to be with Petitioner.  (Dkt. # 16-7, Tr. Vol. II at 181-82).  The State provided a copy of those recordings to Petitioner's counsel.  Petitioner's counsel stated for the record that he had received the copy and would listen to it during the lunch hour.  Id. at 182.  The record shows that Petitioner's counsel did receive a copy of the recordings.  Thus, Petitioner's claim is disproved by the record.  This claim has no merit.

47

Petitioner also argues that he was denied the results of a blood alcohol test from McGrew. (Dkt. # 1 at 36). Petitioner argues that Oklahoma law "requires the testing of all drivers in a fatality accident pursuant to 47 O.S. §752 and yet [Petitioner] was not supplied a blood alcohol test of the driver, Robert McGrew, despite testimony that he had been at a bar that night." (Dkt. # 1 at 36-37).

After a careful reading of OKLA. STAT. tit. 47, § 752, the Court does not find support for Petitioner's interpretation of that statute. Section 752 does not require the testing of all drivers in a fatality accident. However, OKLA. STAT. tit. 47, § 10-104, offers support for Petitioner's argument. The statute reads,

> Any driver of any vehicle involved in an accident who could be cited for any traffic offense where said accident resulted in the immediate death or great bodily injury, as defined in subsection B of Section 646 of Title 21 of the Oklahoma Statutes, of any person shall submit to drug and alcohol testing as soon as practicable after such accident occurs. The traffic offense violation shall constitute probable cause for purposes of Section 752 of this title and the procedures found in Section 752 of this title shall be followed to determine the presence of alcohol or controlled dangerous substances within the driver's blood system.

OKLA. STAT. tit. 47, § 10-104(B). In interpreting this section of the statute, Oklahoma courts have taken the plain meaning approach, finding that this section applies to all drivers involved in fatality accidents. See Guest v. State, 42 P.3d 289, 291 (Okla. Crim. App. 2002); Sanders v. State, 60 P.3d 1048, 1050 (Okla. Crim. App. 2002) (recognizing that it "may not always be possible to issue a traffic citation or affect [sic] an arrest at the accident scene" or "come to a conclusion . . . at the site as to who caused the accident"); Bemo v. State, 298 P.3d 1190, 1191 (Okla. Crim. App. 2013) ("An arrest is not a prerequisite for the withdrawal of blood under 47 O.S.2011, § 10-104(B).").

It is undisputed that McGrew was the driver of the vehicle hit by Petitioner's vehicle. There is also no dispute that Mr. Brown, the passenger in McGrew's car, died as a result of the injuries he sustained from the collision. In addition, there was testimony that McGrew's light was red when

he attempted to make the left turn.  (Dkt. # 16-7, Tr. Vol. II at 442; Dkt. # 16-8, Tr. Vol. III at 612).

Further, there is no record of a blood alcohol test for McGrew.  The State also filed a motion in

limine seeking to prohibit Petitioner from inquiring into the blood alcohol level of McGrew at trial.

(Dkt. # 16-21, O.R. at 129; Dkt. # 16-5, Tr. Hr'g Sept. 12, 2008 at 8).  In support of the motion, the

State argued that there was no information in the record that suggested he had been under the

influence or had ingested any type of alcohol.  (Dkt. # 16-5, Tr. Hr'g Sept. 12, 2008 at 8).  The State

produced the medical records from McGrew's treatment at St. John Medical Center and records

from EMSA, the ambulance service that transported McGrew to the hospital from the scene of the

collision.  The State argued that these reports show "through a hematology and chemistry profile

done on him," that McGrew did not have drugs or alcohol in his system.  Id.; (Dkt. # 16-21, O.R.

at 132-140).  The court overruled the State's motion, but cautioned Petitioner's counsel regarding

the scope of his cross-examination on the issue.  (Dkt. # 16-5, Tr. Hr'g Sept. 12, 2008 at 11).

On cross-examination at trial, McGrew testified that he did not know if his blood had been

drawn.  (Dkt. # 16-8, Tr. Vol. III at 614).  On redirect, he testified that he had turned over his

medical records and that he was questioned by a police officer as to whether he had been drinking.

Id. at 614-16.  McGrew told the officer he had not been drinking and again stated that no one had

requested he provide blood for a blood alcohol test.  Id. at 615-16.

The record before this Court includes McGrew's medical records.  (Dkt. # 16-21, O.R. at

132-140).  Nothing in these records clearly suggests that alcohol or drugs were or were not detected

in McGrew's blood work.  In addition, McGrew testified that, although he had visited two or three

49

bars, he had not consumed any alcohol that evening.[14]   (Dkt. # 16-8, Tr. Vol. III at 586-88).

Sergeant Bondy also testified that when he spoke to McGrew at the hospital the night of the

collision, there was no "identifiable odor of alcoholic beverage about his breath and person" and

nothing indicated that he had consumed alcohol that evening.  Id. at 658.

Based on the facts discussed above, the Court finds no merit to Petitioner's claim that the

State suppressed exculpatory evidence.  As discussed above, a state violates a defendant's due

process rights when it fails to disclose evidence that is material to the defendant's guilt.  Brady, 373

U.S. at 87.  However, if the evidence does not possess apparent exculpatory value before officials

fail to preserve it, it may be considered only "potentially useful" evidence.  Arizona v. Youngblood,

488 U.S. 51, 58 (1988).  While a measurement of McGrew's blood alcohol level was "potentially

useful" to Petitioner, "due process will not be implicated unless the defendant shows that the police

acted in bad faith in failing to preserve it."  Russell v. Watkins, 112 F. App'x 721, 723 (10th Cir.

2004) (unpublished) (citing Youngblood, 488 U.S. at 58).  However, Petitioner does not allege any

instances of bad faith with respect to the failure to collect McGrew's blood to determine whether

any drugs or alcohol were in his system at the time of the collision.  Further, the record does not

reflect any instances of bad faith with respect to the collection of McGrew's blood.  Petitioner fails

to show that he was denied due process.

---

[14]McGrew explained that he was a percussionist and that he frequently played with bands performing at bars.  See Dkt. # 16-8, Tr. Vol. III at 585.  The night of this accident, he played with a band at Uncle Bentley's, a bar/restaurant located at 48th Street and Sheridan Road.  Id. at 586.  He left Uncle Bentley's and went to Mad Murphy's, a bar at 58th Street and Lewis Avenue.  Id. at 587.  While at Mad Murphy's, he saw Richard Brown and agreed to give him a ride to his girlfriend's house.  Id. at 590.  McGrew testified that he "laid down drinking and driving 16 years ago when I started my cab deal and I swore against drinking and driving and I haven't done it since.  Id. at 589-90.

Thus, the Court finds that the record disproves Petitioner's claim that he failed to receive a copy of the recorded interviews. The Court also finds that Petitioner fails to show that the police acted in bad faith in failing to obtain a blood draw from McGrew for the purpose of determining his blood alcohol level the night of the collision. Therefore, Petitioner's underlying claims have no merit and he fails to show that his appellate counsel provided ineffective assistance in failing to raise these claims on direct appeal.

In summary, after reviewing the merits of the claims underlying Petitioner's Ground IX claim of ineffective assistance of appellate counsel, the Court concludes that none of the underlying claims has merit. Therefore, because these issues are meritless, appellate counsel did not perform deficiently in failing to raise the claims on direct appeal. See Cargle, 317 F.3d at 1202. Petitioner's request for habeas corpus relief on Ground IX is denied.

## C.     Procedural Bar

Respondent asserts that Petitioner's claims raised in Grounds I, II, III, VI, VII, VIII, and X are procedurally barred from habeas review. (Dkt. # 14 at 17). This includes Petitioner's claim of ineffective assistance of trial counsel mentioned in Ground II. The doctrine of procedural default prohibits a federal court from considering a specific habeas claim where the state's highest court declined to reach the merits of that claim on independent and adequate state procedural grounds, unless a petitioner "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claim[] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 724 (1991); see also Maes v. Thomas, 46 F.3d 979, 985 (10th Cir. 1995); Gilbert v. Scott, 941 F.2d 1065, 1067-68 (10th Cir. 1991). "A state court finding of procedural default is independent if it is separate and distinct

from federal law." Maes, 46 F.3d at 985. A finding of procedural default is an adequate state ground if it has been applied evenhandedly "'in the vast majority of cases.'" Id. (citation omitted).

When the underlying claim is ineffective assistance of counsel, the Tenth Circuit Court of Appeals has recognized that countervailing concerns justify an exception to the general rule of procedural default. Brecheen v. Reynolds, 41 F.3d 1343, 1363 (10th Cir. 1994) (citing Kimmelman v. Morrison, 477 U.S. 365 (1986)). The unique concerns are "dictated by the interplay of two factors: the need for additional fact-finding, along with the need to permit the petitioner to consult with separate counsel on appeal in order to obtain an objective assessment as to trial counsel's performance." Id. at 1364 (citing Osborn v. Shillinger, 861 F.2d 612, 623 (10th Cir. 1988)). The Tenth Circuit explicitly narrowed the circumstances requiring imposition of a procedural bar on ineffective assistance of counsel claims first raised collaterally in English v. Cody, 146 F.3d 1257 (10th Cir. 1998). In English, the circuit court concluded that:

> Kimmelman, Osborn, and Brecheen indicate that the Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone. All other ineffectiveness claims are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied.

Id. at 1264 (citations omitted).

After reviewing the record in this case in light of the factors identified in English, the Court concludes that the procedural bar imposed by the OCCA was independent and based on state law grounds adequate to preclude habeas corpus review. As to all claims except ineffective assistance of trial counsel, the procedural bar is adequate because the OCCA routinely bars claims that could have been but were not raised on direct appeal. See Smith v. Workman, 550 F.3d 1258, 1274 (10th Cir. 2008). In addition, the state court's procedural bar, as applied to Petitioner's claims, was an

52

"independent" ground because Petitioner's failure to comply with state procedural rules was "the exclusive basis for the state court's holding." Maes, 46 F.3d at 985. Therefore, Grounds I, II, III, VI, VII, VIII, and X are procedurally barred.

As for Petitioner's claim of ineffective assistance of trial counsel, and for purposes of the first requirement identified in English, the Court finds that Petitioner had the opportunity to confer with separate counsel on appeal. At trial, Petitioner was represented by attorney Allen M. Smallwood. On appeal, Petitioner was represented by attorney Kevin D. Adams. The second English factor requires that the claims could have been resolved either "upon the trial record alone" or after adequately developing a factual record through some other procedural mechanism. English, 146 F.3d at 1263-64. Even if Petitioner's ineffective assistance of trial counsel claim could not be resolved on the trial record alone, Petitioner has not alleged that the Oklahoma remand procedure, as provided by Rule 3.11 of the Oklahoma Court of Criminal Appeals, was inadequate to allow him to supplement the record on his ineffective assistance of counsel claim. See Hooks v. Ward, 184 F.3d 1206, 1217 (10th Cir. 1999) (once the state pleads the affirmative defense of an independent and adequate state procedural bar, the burden shifts to the petitioner to make specific allegations as to the inadequacy of the state procedure). Although Respondent alleged an independent and adequate procedural bar, Petitioner has not put the adequacy of Oklahoma's remand procedure at issue. As a result, Petitioner cannot demonstrate that Oklahoma's procedural bar is inadequate and his claim of ineffective assistance of trial counsel, contained in Ground II, is procedurally barred.

This Court may not consider Petitioner's procedurally barred claims unless he is able to show cause and prejudice for the default, or demonstrate that a fundamental miscarriage of justice would result if his claims are not considered. See Coleman, 501 U.S. at 750. The cause standard requires

53

a petitioner to "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." Murray v. Carrier, 477 U.S. 478, 488 (1986).  Examples of such external factors include the discovery of new evidence, a change in the law, and interference by state officials. Id.  As for prejudice, a petitioner must show "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982).  The "fundamental miscarriage of justice" exception to a procedural bar applies "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 495-96 (1986); Herrera v. Collins, 506 U.S. 390, 403-04 (1993); Sawyer v. Whitley, 505 U.S. 333, 339-41 (1992); Schlup v. Delo, 513 U.S. 298 (1995).  A "fundamental miscarriage of justice" instead requires a petitioner to demonstrate that he is "actually innocent" of the crime of which he was convicted.  McCleskey v. Zant, 499 U.S. 467, 494 (1991).

Petitioner attributes the failure to raise the defaulted claims in Grounds I, II, III, VI, VII, and VIII, to ineffective assistance of appellate counsel.  (Dkt. # 1 at 37-38).  Petitioner does not identify "cause" for the failure to raise Ground X on direct appeal.[15] Id. at 40-41.  It is well established that, in certain circumstances, counsel's ineffectiveness can constitute "cause" sufficient to excuse a state

───────────────

[15]Petitioner raised Ground X in his application for post-conviction relief in Tulsa County District Court.  In the order denying Petitioner's application for post-conviction relief, the Tulsa County District Court recited the following from Petitioner's application:

'I was convicted of a violation of title 47 U.S. 10-102(1) when I was charged with a violation of Title 47 O.S. 10-102 and bound over only on that charge.'  In response to the question, 'Is this a proposition that could have been raised on Direct Appeal?' the Petitioner responds by stating, 'Yes, but my appellate counsel failed to raise this issue.  It is fundamental error and shows ineffective assistance and [sic] appellate counsel.'

(Dkt. #14-4 at 6).  In his habeas petitioner, Petitioner did not cite ineffective assistance of appellate counsel as cause for failing to raise this claim on direct appeal.

prisoner's procedural default.  See Carrier, 477 U.S. at 488-89.  However, the assistance provided by appellate counsel must rise to the level of a constitutional violation under the two-pronged standard established in Strickland.

The Court addressed Petitioner's claims of ineffective assistance of appellate counsel for failure to raise Grounds I, II, III, VI, VII, and VIII, see Part B(3), above, and found the claim to be without merit.  As a result, Petitioner's ineffective assistance of appellate counsel claim cannot serve as "cause" to overcome the procedural bar applicable to the those grounds.  As to Ground X, Petitioner fails to demonstrate that some "objective factor external to the defense" impeded his ability to raise Ground X on direct appeal.  Accordingly, Grounds I, II, III, VI, VII, VIII and X are procedurally barred from consideration by the Court unless the "fundamental miscarriage of justice" exception is applicable.

The "fundamental miscarriage of justice" exception to the procedural bar doctrine applies "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Carrier, 477 U.S. at 495-96 (1986).  Petitioner asserts several claims of innocence.  See, e.g., Dkt. # 17 at 5, 9, 14.  These claims of innocence center around the proximate cause of the collision and allegations of improper jury instructions.  These claims are claims of legal innocence, not factual innocence.  Thus, the claims are not sufficient for the "fundamental miscarriage of justice" exception.  See Bousley v. United States, 523 U.S. 614, 623 (1998) ("It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency.").  Petitioner has not set forth a fundamental miscarriage of justice argument to excuse his procedural default.  Therefore, the Court concludes that Petitioner does not fall within the narrow "fundamental miscarriage of justice" exception.

Having failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice will result if this Court does not consider his claims, the Court finds that Grounds I, II, III, VI, VII, VIII and X are procedurally barred. Habeas corpus relief requested in those grounds shall be denied on that basis.

**D.      Certificate of appealability**

Rule 11, <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings. <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000) (citing <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983)). In addition, when the Court's ruling is based on procedural grounds, Petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" <u>Slack</u>, 529 U.S. at 484.

After considering the record in this case, the Court concludes that a certificate of appealability should not issue. Nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the direct appeal decision by the OCCA was debatable amongst jurists of reason. <u>See</u> <u>Dockins v. Hines</u>, 374 F.3d 935 (10th Cir. 2004). As to those claims denied on a procedural basis, Petitioner has failed to satisfy the second prong of the required showing, i.e.,

that the Court's ruling resulting in the denial of the petition on procedural grounds was debatable or incorrect. The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

### *CONCLUSION*

After careful review of the record in this case, the Court concludes that the Petitioner has not established that he is in custody in violation of the Constitution or laws or treaties of the United States.  His petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.      The Clerk of Court shall substitute Michael Wade, Warden, as party respondent in this case.

2.      The petition for a writ of habeas corpus (Dkt. # 1) is **denied**.

3.      A certificate of appealability is **denied**.

4.      A separate Judgment shall be entered in this case.

**DATED** this 13 day of February, 2014.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE